## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWARD PITTS<br>118 Mooremont Ave.<br>Greenville, SC 29605 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | DOCKET NO.: |
| v. | : | |
| | : | |
| AIRLITE PLASTICS CO.<br>2860 Bath Pike<br>Nazareth, PA 18064 | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

### CIVIL ACTION COMPLAINT

Edward Pitts (*hereinafter* referred to as "Plaintiff," unless indicated otherwise), by and through his undersigned counsel, hereby avers as follows:

### INTRODUCTION

1.     This action has been initiated by Plaintiff against Defendant for violations of Section 1981 of the Civil Rights Act of 1866 ("Section 1981" - 42 U.S.C. § 1981), Title VII of the Civil Rights Act of 1964 ("Title VII" - 42 U.S.C. §§ 2000d *et. seq.*), the Family and Medical Leave Act ("FMLA - 29 U.S.C. §2601 *et. seq.*), the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101 *et. seq.*) and the Pennsylvania Human Relations Act ("PHRA").[1] Plaintiff asserts, *inter alia*, that he was unlawfully terminated by Defendant. As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff will move to amend the instant Complaint to include violations of the PHRA after administrative remedies are properly exhausted according to the PHRA. Such claims will identically mirror Plaintiff's federal claims asserted herein under Title VII.

## JURISDICTION AND VENUE

2.     This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under the laws of the United States (42 U.S.C. §1981). This Court has supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same circumstances and are based upon a common nucleus of operative fact.

3.     This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.     Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because substantially all of the events or omissions giving rise to the claims set forth herein occurred in this judicial district, in addition, venue is properly laid in this district because Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania for the purposes of this action.

5.     Plaintiff is proceeding herein under Title VII (in addition to other claims laid out herein) and has properly exhausted his administrative remedies with respect to these claims by timely filing Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC")[2] and by filing the instant lawsuit within ninety (90) days of receiving notice of dismissal and/or right to sue letters from the EEOC.

---

[2] In conjunction with the respective EEOC filings, Plaintiff dual-filed Complaints for violations of the PHRA, in accordance with procedure set by the EEOC and Pennsylvania Human Relations Commission ("PHRC").

**PARTIES**

6.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.      Plaintiff is an adult individual with an address as set forth in the above-caption. During Plaintiff's employment relevant to this action, he was a resident of the Eastern District of Pennsylvania.

8.      Defendant Airlite Plastics Co. (*hereinafter* "Defendant") is a for-profit entity incorporated and headquartered in Nebraska, doing business in the Commonwealth of Pennsylvania at an address as set forth in the above-caption (the location at which Plaintiff worked).

9.      At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

**FACTUAL BACKGROUND**

10.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.      Plaintiff is a black, African-American male.

12.      On or about September 29, 2014, Plaintiff was hired and began working for Defendant as a machine operator at Defendant's Nazareth, Pennsylvania, production plant (*hereinafter* "Nazareth location").

13.      Upon information and belief, during Plaintiff's employment with Defendant, out of the approximately fifty (50) employees at Defendant's Nazareth location, Plaintiff was the

only[3] black/African-American employee at his location and the majority of Defendant's employees were Caucasian.

14.     Throughout his employment with Defendant, Plaintiff was a dedicated and hard-working employee who performed his job well.

15.     Plaintiff has and continues to suffer from serious chronic health conditions, including but not limited to anxiety and hypertension.

16.     Plaintiff was, and continues to be, substantially limited in his ability to perform major life activities as a result of his chronic health conditions, which require daily medications, cause insomnia, and on rare occasions can cause shortness of breath and fainting.

17.     Despite Plaintiff's health conditions, he was still able to perform the duties of his job well; however, periodically Plaintiff's aforesaid conditions resulted in episodic flare-ups requiring him to stay home from work intermittently.

18.     In or about February of 2015 (before requesting medical accommodations or complaining to management of discrimination, described further *infra*), Plaintiff was promoted to Senior (or "Lead") machine operator, a position with some supervisory responsibilities over approximately 2-4 employees.

19.     During Plaintiff's employment with Defendant, Plaintiff was subjected to racially discriminatory harassment by other employees (in particular, lead machine operator, Steve Kresge, *hereinafter* "Mr. Kresge"), which was permitted by Defendant's management.

20.     For example[4]:

---

[3] Another African American employee was employed at the beginning of Plaintiff's employment, but upon information and belief was terminated in early 2016.

[4] The foregoing are merely examples of the ways that Plaintiff was subjected to racial discrimination during his employment with Defendant and is not intended to be an exhaustive list.

a. In or about the latter half of 2015, Mr. Kresge stated that then-President of the United States, Barack Obama, was taking employees' payroll taxes to spend on "chicken and watermelon" (which Plaintiff took to be a derogatory comment about African-Americans);

b. Unlike Plaintiff's non-black co-workers, Mr. Kresge would treat Plaintiff in a rude and hostile manner, such as by moving and hiding Plaintiff's work tools; and

c. Plaintiff's co-workers informed him on multiple occasions that Mr. Kresge would often refer to Plaintiff as "the colored guy" and sometimes referred to Plaintiff as "nigger" and "dumb a** nigger."

21. Plaintiff was also subjected to racially-discriminatory labels on equipment in the workplace (that could have no fathomable work-related purpose) which again was permitted by Defendant's management; for example:

a. Machines which bore the labels "master" / "slave" prominently on their electronic (LED) user screens; and

b. Pieces of equipment which bore the labels "white guys" / "black guys."

22. In or about late 2015, Plaintiff began to complain about the racial discrimination and harassment he was being subjected to by Mr. Kresge (described *supra*) to Defendant's management, including but not limited to Plaintiff's manager, Harry Miller ("Mr. Miller") and John Bungert ("Mr. Bungert" – also a Manager at Defendant).

23. Upon information and belief, Defendant's Nazareth location (at which Plaintiff worked) did not employ any full-time Human Resources personnel until in or about the

Spring/Summer of 2016, when Steve Green (*hereinafter* "Mr. Green") began as a Human Resources Generalist at Defendant's Nazareth location.

24. In or about 2016, shortly after Mr. Green began working at Plaintiff's location, Plaintiff complained to Mr. Green, as well as Plant Manager - Tony Alfiero ("Mr. Alfiero"), on several occasions about the aforesaid racially-discriminatory harassment he was being subjected to in the workplace, specifically by Mr. Kresge.

25. Despite Plaintiff's repeated complaints of racially-discriminatory harassment (described *supra*), Defendant never properly investigated nor resolved Plaintiff's aforesaid complaints and Mr. Kresge was not noticeably disciplined.

26. In or about late August of 2016, Plaintiff was approached by Mr. Kresge on Defendant's property (in the parking lot) and Mr. Kresge verbally threatened Plaintiff; Plaintiff was also told that same day (by other employees) that Mr. Kresge had specifically threatened to go to Plaintiff's home and cause harm to Plaintiff and his family; Plaintiff immediately reported Mr. Kresge's threats to Defendant's management (described further *infra*).

27. On or about August 24, 2016, Plaintiff complained to Defendant's Human Resources, specifically H.R. Generalist, Mr. Green, and Defendant's Director of Human Resources - Lori Bruckner ("Ms. Bruckner"),[5] of Mr. Kresge's recent threatening remarks and history of racial animus towards Plaintiff (described *supra*); Plaintiff *specifically* told Mr. Green and Ms. Bruckner that he felt was being mistreated because he was black and African American.

28. Despite Plaintiff specifically complaining to Defendant's Human Resources of Mr. Kresge's threats and history of racial harassment towards Plaintiff (described *supra*), Plaintiff's complaints were still not properly investigated nor resolved, instead Mr. Kresge was

---

[5] Ms. Bruckner only visited Defendant's Nazareth location periodically as, upon information and belief, she primarily worked out of Defendant's Nebraska headquarters.

not noticeably disciplined and Plaintiff was met with further hostility from Defendant (described further *infra*).

29.     In or about early September of 2016, shortly after Plaintiff complained to Defendant's Human Resources ("H.R.") of Mr. Kresge's threats and history of racial harassment towards Plaintiff (described *supra*), Plaintiff's overtime was significantly restricted; Plaintiff's overtime being restricted (for no discernible work-related reason) was clearly in retaliation for his recent complaints of racial harassment to H.R. (described *supra*), considering:

a. Plaintiff was initially told about the overtime restriction by Mr. Kresge (whom Plaintiff had *just* complained about to H.R. for racial harassment), wherein he was told there was no more overtime for second shift (Plaintiff's shift);

b. When Plaintiff asked his manager Lloyd Sabol (aka "Spike," *hereinafter* "Mr. Sabol") as to why Plaintiff's overtime was being restricted, Plaintiff was given no explanation other than the decision "came from higher up";

c. Plaintiff was thereafter required to get approval for any overtime (which he was granted sparingly); however, in the past, Plaintiff was permitted to work as much overtime as he wanted as long as work was available;

d. Upon information and belief, other (non-black) employees in the same or similar position as Plaintiff, *including Mr. Kresge*, were [1] not required to have all overtime approved; and [2] permitted to work more overtime than Plaintiff; and

e. Plaintiff was the Lead over 2-3 other employees on second shift (all Caucasian) whom continued to be permitted to work more overtime than

Plaintiff (i.e. clearly evidencing the overtime restriction was specifically being enforced against Plaintiff and not his shift).

30.     In or about early September of 2016, Plaintiff asked Defendant's management whether he could take time off due to his anxiety and hypertension (a reasonable accommodation), a request which Defendant (including but not limited to Mr. Green) initially rebuffed.

31.     On or about September 6, 2016, Plaintiff filed a Charge of Discrimination with the EEOC against Defendant, specifically alleging race and disability discrimination, hostile work environment, and retaliation (as detailed *supra*).[6]

32.     In or about late September of 2016, upon information and belief, Defendant received notice that Plaintiff had complained to the EEOC (described *supra*).

33.     After learning of Plaintiff's EEOC complaint, Defendant failed to properly investigate or resolve Plaintiff's concerns and disclosed his complaints of discrimination to Plaintiff's co-workers and members of management, as evidenced by the following:

  a.  The offensive equipment identified in Plaintiff's EEOC Charge (described *supra*), some of which had been up in full view of management for years, was finally taken down;

  b.  Other employees (including co-workers not in human resources or management) stated to Plaintiff they "don't want to get sued;"

  c.  Plaintiff continued to have his overtime hours restricted (despite other employees, including those Plaintiff supervised, being allowed more overtime); and

---

[6] The EEOC marked Plaintiff's Charge "Received" on September 14, 2016.

    d.  In contrast, the individuals identified in Plaintiff's EEOC Charge were not noticeably disciplined (including Mr. Kresge) and continued to be permitted more overtime than Plaintiff.

34.    In or about late September of 2016, Plaintiff took off approximately one week of FMLA-qualifying leave for his own serious health conditions.

35.    Plaintiff also continued to take FMLA-qualifying leave due to his own health conditions (described *supra*) intermittently through the end of his employment (approximately 1-2 days every three weeks).

36.    In or about the Fall of 2016, Plaintiff complained to Defendant's management on multiple occasions (including but not limited to Plaintiff's supervisor - Mr. Sabol, and night shift supervisor - "John") of the ongoing discriminatory/retaliatory treatment Plaintiff was being subjected to, including specifically with respect to overtime (described *supra*).

37.    During his aforesaid complaints to John, Plaintiff specifically asked John why other (Caucasian) employees, including employees on the same shift as Plaintiff, were working significant overtime while Plaintiff (and seemingly only Plaintiff) was having his overtime restricted - Plaintiff was never provided with an answer from Defendant's management.

38.    Through the end of 2016 and early 2017, Plaintiff continued to be subjected to increased hostility and animosity from Defendant's management, including but not limited to (1) expressing pretextual concerns with Plaintiff's work performance (which had always been positive, as shown by Plaintiff being promoted - *before* having complained of discrimination, described *supra*); and (2) Plaintiff being verbally reprimanded (on at least one occasion) by Mr. Alfiero (Plant Manager) and Shift Supervisor - "Bill" due to pretextual concerns apparently raised to them by Mr. Kresge himself (Plaintiff's harasser and not a supervisor over Plaintiff).

39.    In or about early January of 2017, Plaintiff again complained multiple times to Defendant's management, including but not limited to Defendant's CEO/president (Brad Crosby, *hereinafter* "Mr. Crosby") and vice-president (Pat Kenealy), about the ongoing "discrimination" and harassment he was being subjected to in connection with his race and his aforementioned complaints of discrimination to the EEOC (described *supra*).

40.    On or about January 16, 2017, approximately a week after complaining to Defendant's CEO/president (Mr. Crosby) of ongoing racial discrimination and retaliation (described *supra*), Plaintiff was met with further hostility from Defendant's management, for example:

a.    Plaintiff's manager, Mr. Sabol, told Plaintiff that his "boat is sinking right now;"

b.    Plaintiff was told he would not be allowed to work *any* further overtime at all (although what Plaintiff had been allowed to work since complaining of discrimination was minimal compared to other employees) without being provided with any explanation for said increased overtime restriction; and

c.    Plaintiff's manager, Mr. Sabol, told Plaintiff that **"no matter what you do, anything that you do, they [Defendant] will find a reason to get rid of you"** (i.e. for Plaintiff complaining of discrimination and not any legitimate work-related reason).

41.    On or about January 26, 2017, another employee (Corinna Deemer, *hereinafter* "Ms. Deemer") texted Plaintiff racially-harassing remarks (calling Plaintiff a "lying black piece of s***") and then approached and cornered Plaintiff while he was on break, verbally and physically assaulting Plaintiff. After escaping the situation, Plaintiff *immediately* reported the

altercation to his supervisor and to H.R. (Mr. Green), including the racially discriminatory remarks Ms. Deemer had texted to Plaintiff shortly prior.

42.     On or about January 26, 2017, shortly after reporting the altercation with Ms. Deemer (described *supra*), Mr. Sabol told Plaintiff "this may be it" (i.e. referring to the conversation less than two weeks prior where Mr. Sabol said Defendant would find any reason to "get rid of" Plaintiff, described *supra*).

43.     Plaintiff was shortly thereafter terminated (on or about January 31, 2017).

44.     Plaintiff was told of his termination by Mr. Green, with the only explanation being that the decision "came from higher up" and was made following Defendant's purported investigation into the aforesaid incident with Ms. Deemer.

45.     After Plaintiff's termination, in Defendant's Position Statement submitted to the EEOC in conjunction with this matter (sometimes referred to as an "Answer"), Defendant asserted (for the first time) that Plaintiff was terminated for "physically assaulting" Ms. Deemer, which is completely pretextual considering:

    a.  Plaintiff did not commit violence or assault the co-worker in any way and it was actually Plaintiff who had been assaulted[7] (which he immediately reported to management), described *supra*;

    b.  Despite Defendant's contention that Plaintiff had assaulted Ms. Deemer, Defendant never reported the incident to the police; furthermore, after the incident was reported by Plaintiff to H.R. and H.R. spoke to both parties, Defendant did not immediately suspend Plaintiff (rather Plaintiff *himself* requested if he could leave work early due to Ms. Deemer assaulting him);

---

[7] Plaintiff was approximately twice the size of Ms. Deemer and did not sustain any injuries.

c.  Plaintiff had no history of misconduct or formal discipline in his over two (2) years of employment for Defendant; and

d.  In contrast, other *non-black*[8] employees had significant misconduct reported to H.R. and were not terminated (nor noticeably disciplined), including Mr. Kresge (Caucasian), who had threatened both Plaintiff and his family, which Plaintiff had reported to Mr. Green as well as Defendant's Director of H.R. (described *supra*).

46.  Plaintiff therefore believes and avers that he was subjected to a hostile work environment, had his overtime (wages) reduced, and was pretextually terminated due to his: race, disabilities, in retaliation for complaining of race and disability discrimination, and/or in retaliation for requesting time off for his health conditions (FMLA-qualified leave and a reasonable accommodation under the ADA).

### Count I
### Violations of 42 U.S.C. § 1981
### ([1] Race Discrimination; [2] Retaliation; [3] Hostile Work Environment)

47.  The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

48.  During his employment with Defendant, Plaintiff was treated in a disparate and discriminatory manner as compared to his non-black co-workers.

49.  Defendant's employee(s) (including but not limited to Mr. Kresge) treated Plaintiff in a rude and derogatory manner, including making racially-derogatory comments to

---

[8]Upon information and belief, in 2016, the only other African-American employee at the Nazareth location (other than Plaintiff) was terminated for an alleged verbal altercation (also relatively minor compared to the reported misconduct of non-black employees who were neither terminated nor noticeably disciplined).

Plaintiff, referring to Plaintiff as "nigger," and putting up racially-discriminatory labels in the workplace such as "master" / "slave" (all described more fully *supra*).

50.     Plaintiff complained to Defendant's management on multiple occasions about the racially-discriminatory harassment he was being subjected to by Mr. Kresge, moreover the racially-discriminatory equipment labels were in full view of management, such that Defendant's management would have been aware of them.

51.     Instead of ever properly investigating or resolving Plaintiff's complaints of racial discrimination, Defendant's management met Plaintiff with further hostility, including (but not limited to) reducing Plaintiff's overtime, thereby reducing his pay, and forcing Plaintiff to get permission for overtime (unlike his Caucasian co-workers, including Mr. Kresge).

52.     In or about September of 2016, after Defendant failed to address Plaintiff's internal complaints of discrimination (described *supra*), Plaintiff complained to the EEOC by way of filing a Charge of Discrimination against Defendant, specifically alleging race and disability discrimination, hostile work environment, and retaliation.

53.     Upon information and belief, Defendant received notice of Plaintiff's EEOC Charge while Plaintiff was still employed.

54.     Shortly prior to Plaintiff's termination, the EEOC Charge was specifically discussed between Plaintiff and Defendant's president Mr. Crosby, while Plaintiff also complained of ongoing racial harassment and discrimination.

55.     The racial harassment (and subsequent retaliation) that Plaintiff was subjected to during his employment with Defendant was severe and pervasive and interfered with Plaintiff's work to the extent that Plaintiff had to complain on several occasions: first to Defendant's

management, then to the EEOC, then to Defendant's executive team including its president (based out of Nebraska) (all described *supra*).

56.    Upon information and belief, despite Plaintiff's repeated complaints of racial discrimination/harassment, Defendant's management never properly investigated nor resolved his concerns (and the aforesaid discrimination continued).

57.    On or about January 31, 2017, after being subjected to great hostility and animosity because of his race and/or complaints of race discrimination, Plaintiff was ultimately terminated from his employment with Defendant for completely pretextual reasons.

58.    Plaintiff therefore believes that he was subjected to a hostile work environment, had his overtime (wages) reduced, and was pretextually terminated from his employment with Defendant because of his race and/or because of his complaints of race discrimination.

59.    These actions as aforesaid constitute unlawful discrimination, retaliation, and a hostile work environment under the 42 U.S.C. §1981.

## Count II
## Violations of Title VII
### ([1] Race Discrimination; [2] Retaliation; [3] Hostile Work Environment)

60.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

61.    Plaintiff reasserts and re-alleges each and every allegation and claim as set forth in Count I above, as such actions also constitute violations of Title VII.

## Count III
## Violations of the Americans with Disabilities Act, as Amended ("ADA")
### ([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Failure to Accommodate)

62.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

63.    Plaintiff suffered from qualifying health conditions under the ADA (including but not limited to anxiety and hypertension) which affected his ability (at times) to perform some daily life activities including, but not limited to sleeping, breathing, and working.

64.    Despite Plaintiff's health conditions, he was still able to perform the duties of his job well; however, periodically Plaintiff's condition resulted in episodic flare-ups requiring him to stay home from work intermittently.

65.    Plaintiff requested reasonable accommodations from Defendant, including but not limited to intermittent time off from work (FMLA-qualifying leave) to care for and treat his health conditions.

66.    Plaintiff's aforesaid health conditions were known by Defendant's management and disclosed in writing by way of Plaintiff submitting FMLA medical forms, requesting intermittent time off.

67.    In or about September of 2016, Plaintiff complained to the EEOC of, *inter alia*, discrimination under the ADA.

68.    Plaintiff took intermittent time off work due to his health conditions (also FMLA-qualifying) through the end of his employment; Defendant's management (including but not limited to Mr. Alfiero and Mr. Sabol) acted hostilely towards Plaintiff when he did request/utilize intermittent time off (which was FMLA-qualifying) by drawing attention to Plaintiff's health-needed time off whenever Plaintiff returned to work.

69.    In or about mid-January of 2017, approximately two weeks before being terminated for pretextual reasons (described *supra*), Plaintiff requested and took two days off work due to a flare-up in his health conditions (FMLA-qualifying leave).

70.    Plaintiff therefore believes and avers he had his overtime (wages) reduced and was terminated from Defendant because: (1) of his known and/or perceived health problems; (2) of his record of impairment; (3) of his requested accommodations; and/or (4) of Defendant's refusal to accommodate his disabilities.

71.    Plaintiff also believes and avers he was subjected to a hostile work environment and terminated due to his complaint of disability discrimination to the EEOC (made in conjunction with complaining of race discrimination).

72.    These actions as aforesaid constitute violations of the ADA.

### Count IV
### Violations of the Family and Medical Leave Act ("FMLA")
### ([1] Interference and [2] Retaliation)

73.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

74.    Plaintiff was an eligible employee under the FMLA, having worked for the Defendant at least one year and having worked more than 1,250 hours in the year. 29 U.S.C. § 2611(2)(A).

75.    Upon information and belief, Defendant was an employer subject to the FMLA, as Defendant was engaged in an industry affecting commerce and employed fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year. 29 U.S.C. § 2611(4)(A)(i).

76.     Plaintiff was entitled to receive leave for a total of twelve (12) work weeks because Plaintiff suffered from serious health conditions, which (at times) affected his ability to work (described *supra*). 29 U.S.C. § 2612 (a)(1)(D).

77.     In or about early September of 2016, Plaintiff specifically inquired about applying for FMLA leave through Defendant (for his own serious health conditions) and was met with hostility by on-site H.R. Generalist, Mr. Green.

78.     Specifically, in response to Plaintiff's aforesaid request for FMLA in September of 2016, Mr. Green told Plaintiff that employees only use FMLA for improper reasons (such as to take time off to watch football or hang out at a bar) and that "a lot of people abuse it." Later, Mr. Green told Plaintiff that Plaintiff's doctor-completed FMLA forms would be inadequate (although they were later approved by another agent of Defendant).

79.     On or about September 27, 2016, Plaintiff requested and was approved for intermittent FMLA leave for his own serious medical conditions (described *supra*)

80.     Between September of 2016 and January of 2017, Plaintiff took FMLA intermittent leave as needed, including taking two days of FMLA leave just two weeks before being terminated for pretextual reasons (described *supra*).

81.     Defendant interfered with Plaintiff's rights under the FMLA by, but not limited to, Defendant's on-site H.R. attempting to dissuade Plaintiff from applying for, and/or utilizing, FMLA leave (described *supra*).

82.     Defendant retaliated against Plaintiff by terminating Plaintiff for pretextual reasons shortly after (1) Plaintiff requested and/or utilized FMLA leave (just two weeks prior); and/or (2) by considering Plaintiff's FMLA needs in making the decision to terminate his employment.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendant is to be prohibited from continuing to maintain its illegal policy, practice or custom of discriminating/retaliating against employees and is to be ordered to promulgate an effective policy against such unlawful acts and to adhere thereto;

B.     Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date he first suffered retaliation/discrimination at the hands of Defendant until the date of verdict;

C.     Plaintiff is to be awarded punitive damages, as permitted by applicable law(s) alleged asserted herein, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.     Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

E.     Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F.     Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

15

G.     Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPE, KARPE & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square
Building 2, Ste. 128
Bensalem, PA 19020
(215) 639-0801

Dated:  August 18, 2017

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| EDWARD PITTS | : | CIVIL ACTION |
| v. | : | |
| AIRLITE PLASTICS CO. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.                             ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.                                                                      ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)                                                                        ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.            (X )

| | | |
|---|---|---|
| 8/21/2017 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 639-0801 | (215) 639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 118 Mooremont Avenue, Greenville, SC 29605

Address of Defendant: 2860 Bath Pike, Nazareth, PA 18064

Place of Accident, Incident or Transaction: Defendant's place of business

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐   No☒

Does this case involve multidistrict litigation possibilities?    Yes☐   No☒

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes☐   No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes☐   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?    Yes☐   No☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes☐   No☐

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Ari R. Karpf, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 8/21/2017    _____    ARK2484

Attorney-at-Law    Attorney I.D.# 91538

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 8/21/2017    _____    ARK2484

Attorney-at-Law    Attorney I.D.# 91538

CIV. 609 (5/2012)

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| PITTS, EDWARD | AIRLITE PLASTICS CO. |

**(b)** County of Residence of First Listed Plaintiff     Greenville
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant     Northampton
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Karpf, Karpf & Cerutti, P.C.; 3331 Street Road, Two Greenwood Square,
Suite 128, Bensalem, PA 19020; (215) 639-0801; akarpf@karpf-law.com

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 1981 of the Civil Rights Act of 1866 (42USC1981), Title VII (42USC2000); FMLA (29USC2601); ADA (42USC12101)
Brief description of cause:
Violations of 42USC1981, Title VII, FMLA, ADA and the PHRA.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE
8/21/2017

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

| Print | Save As... | | Reset |